Laurence M. Rosen (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SÉBASTIEN MESLAGE, Individually and on behalf of all others similarly situated, | No. |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | <u>CLASS ACTION</u> |
| MATCH GROUP, INC., BERNARD KIM, and GARY SWIDLER, | JURY TRIAL DEMANDED |
| Defendants. | |

Plaintiff Sébastien Meslage ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding Match Group, Inc. ("Match Group" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.     This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Match Group securities between May 2, 2023 and November 6, 2024, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## <u>JURISDICTION AND VENUE</u>

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged

1

misstatements entered and the subsequent damages took place in this judicial district.

5.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## **PARTIES**

6.     Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Match Group securities during the Class Period and was economically damaged thereby.

7.     Match Group describes itself as follows:

Match Group, Inc., through its portfolio companies, is a leading provider of digital technologies designed to help people make meaningful connections. Our global portfolio of brands includes Tinder®, Hinge®, Match®, Meetic®, OkCupid®, Pairs™, Plenty Of Fish®, Azar®, BLK®, and more, each built to increase our users' likelihood of connecting with others. Through our trusted brands, we provide tailored services to meet the varying preferences of our users.

8.     Pertinent to this action is the Company's Tinder app. After instituting policies which led to the removal of at least two million Tinder users, which in part contributed to the number of monthly active users ("MAU" or "MAUs") declining, the Company assured the market that it was on a path to positive MAU growth on the Tinder app when in fact it was not.

9.     The Company is incorporated in Delaware and its principal executive offices are in Dallas, Texas. Tinder's headquarters is in Los Angeles, California.

10.     The Company's stock trades on the NASDAQ under the ticker symbol "MTCH."

11.     Defendant Bernard Kim ("Kim") was the Company's Chief Executive Officer ("CEO") throughout the Class Period.

2

12.     Defendant Gary Swidler ("Swidler") was the Company's Chief Financial Officer ("CFO") and President throughout the Class Period.

13.     Defendants Kim and Swidler are collectively referred to herein as the "Individual Defendants."

14.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

15.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

16.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

3

17.     Defendant Match Group and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements Issued During the Class Period

18.     On May 2, 2023, the Company published its Q1 2023 shareholder letter. The letter stated, in pertinent part, the following:

> While Tinder is an iconic brand used by many, our data shows that approximately 40% of eligible singles age 18 to 34 in North America and Europe are still not using Tinder, and an additional approximately 35% have used Tinder previously, but not in the last year ("lapsed users"). This provides amply opportunity for Tinder to bring both singles who have never tried the app and lapsed users into the fold. ***Tinder has a strong history of reactivating lapsed users, and the large pool of lapsed users provides significant opportunity to increase reactivations. The way for Tinder to attract new and lapsed users is to deliver exciting features and a product experience that resonates. We're confident that as Tinder does so, it can both return to stronger new user growth and reactivate the large population of lapsed users, which will ultimately drive revenue growth***.

> (Emphasis added.

19.     The statement in ¶ 18 was materially false and misleading at the time it was made because it understated the difficulty of driving meaningful user growth in the future, considering the Company's pool of lapsed users to reactivate.

20.     On February 23, 2024, the Company filed with the SEC its annual report on Form 10-K for the year ending December 31, 2023 (the "2023 Annual Report"). Attached to the 2023 Annual Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Kim and Swidler attesting to the accuracy of financial reporting, the disclosure of any material

changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

21.    The 2023 Annual Report included the following risk disclosure:

*If we fail to retain existing users or add new users, our revenue, financial results, and business may be significantly harmed.*

*Our financial performance has been and will continue to be significantly determined by our success in adding and retaining users of our services*. In the past we have experienced, and expect to continue to experience, fluctuations in the size of our user base in one or more markets from time to time, particularly in markets where we have achieved higher penetration rates. The size of our user base is also impacted by a number of other factors, including competitive products and services and global and regional business, macroeconomic, and geopolitical conditions. For example, wars in the Middle East and Ukraine have led to reduced supply as well as the decision to suspend our services in Russia.

*Further, if people do not perceive our services to be useful, we may not be able to attract or retain users.* In recent years, some users, particularly younger generations, have shown a decreased appetite for our services and those of our competitors due potentially to a number of factors. *With each new generation of users, expectations of our services change and user behaviors and priorities shift*. As a result, we may need to further leverage our existing capabilities or advances in technologies like artificial intelligence ("AI"), or adopt new technologies, to improve our existing services or introduce new services in order to better satisfy existing users and to expand our penetration of what continues to be a large available new user market. However, there can be no assurances that further implementation of technologies like AI will enhance our services or be beneficial to our business and the introduction of new features or services to our existing services may have unintended consequences on our ecosystem, which could lead to fluctuations in the size of our user base. Additionally, in 2023 we began consolidating some of our legacy brands' platforms in order to decrease operating costs, which may result in changes to the user experience for some of our brands that some existing users may perceive negatively.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

If we are unable to maintain or increase the size of our user base, our revenue and other financial results may be adversely affected. Further, as the size of our user base fluctuates in one or more markets from time to time, we may become increasingly dependent on our ability to maintain or increase levels of monetization in order to grow revenue. Any significant decrease in user retention or growth could render our services less attractive to users, which is likely to have a material and adverse impact on our business, financial condition, and results of operations.

(Emphasis added).

22.     The statement in ¶ 21 was materially false and misleading because it understated the difficulty of retaining existing users or adding new MAUs on the Company's Tinder app, and omitted risks relating to gaining new users after the Company had instituted policies which led to the removal of at least two million Tinder users.

23.     On May 8, 2024, the Company filed with the SEC its report on Form 10-Q for the period ending March 31, 2024 (the "1Q24 Report"). Attached to the 1Q24 Report were certifications pursuant to SOX signed by Defendants Kim and Swidler attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

24.     The 1Q24 Report incorporated by reference the risk disclosures in the 2023 Annual Report, one of which was materially false and misleading when made for the reasons discussed in ¶ 22.

25.     On May 8, 2024, Match Group had its Q1 2024 earnings call.  In this call, Defendant Kim made the following statement:

Tinder's international scale and reach has never been matched by any other dating app. And it's critical that we keep the ecosystem vibrant. ***For example, Tinder took decisive action by changing its community guidelines and moderation practices mid-last year, which better enabled the removal of users who are not on the app for its intended purposes***. ***While the improvements to the ecosystem and benefits to the brand are***

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

*undeniable, these actions did contribute to some of Tinder's MAU declines over the past nine months*.

We believe that actions like these are in the best interest of Tinder's long-term success. ***So we are willing to accept fewer MAU in the short-term*** to create a safer ecosystem and better outcomes for our daters. Diving a little deeper into Tinder, we have heard loud and clear that some users, especially the Gen Z cohort, are looking for more from their dating apps. We have been in this business a long time, and we have consistently adapted our offerings to best serve the needs of different generations and we understand and recognize that expectations of apps are changing.

***Tinder is working tirelessly to execute against their strategy, and I'm incredibly confident in the team's ability to satisfy these evolving expectations that users have. By the end of the year, we expect to have a significantly improved product***. Similarly, pressures on discretionary consumer spending, especially among Tinder's younger user base, have negatively impacted Tinder's a la carte revenue. The team is doubling down on its efforts to improve the efficacy of its current ALC features and introduce new offerings at affordable price points. We expect to see improvements in ALC trends by the back half of the year. We know we have work to do to satisfy every new generation of daters. The Tinder team is working to improve the dating journey at every point of the experience. ***Through innovation, especially with AI, we believe we can improve the quality of profiles, matching outcomes, safety features, and the post-match experience to make the entire Tinder platform more modern and deliver on their brand promise.***

I've asked our Chief Technology Officer and his central innovation team to work even more closely with Tinder's product team to expedite all these efforts which are underway. ***And given Tinder's vast scale and knowledge about relationships and dating, there is no dating app better positioned to take advantage of these advances in technology***. Tinder has become an industry defining highly profitable business over the past decade. We have been innovating to solve some of the user pain points. As a result, we will have a healthier, more satisfying, and ultimately more valuable experience for daters to enjoy.

***And I am confident that Tinder's momentum will come back. We believe we have real market opportunity and the right teams and strategies in***

7

*place to get to that next level of growth*. And we are determined to deliver that for all of our stakeholders. We continue to see significant growth runway at Hinge and our emerging brands portfolio. ***We're executing on our turnaround plan for Tinder and our central innovation teams are bringing renewed vigor to product innovation***. We are excited to continue this work as giving people new, exciting ways to connect is what motivates us every day. And with that, let me turn it over to Gary.

(Emphasis added).

26.     The statement in ¶ 25 was materially false and misleading because it understated the extent of Match Group's challenge with gaining monthly active users on the Tinder app, after it instituted policies which led to the removal of at least two million Tinder users.

27.     On July 31, 2024, the Company held its Q2 2024 earnings call.

28.     On the Q2 2024 earnings call, Defendant Swidler made the following statement:

Focusing on user trends, we saw sequential stability in Tinder's MAU, which were down 9% year-over-year in Q2, as was the case in Q1. MAU at Tinder have now been relatively stable since March. ***A large decline in MAU began in July of last year, driven in large part by changes we made to Tinder's trust and safety policies to remove people who are not truly on the app to connect that has now begun to stabilize***.

With much of this impact now behind us and given Tinder's various ongoing product and marketing initiatives, ***we're confident Tinder's year-over-year MAU declines should continue to moderate as this year passes***.

(Emphasis added).

29.     The statement in ¶ 28 was materially false and misleading at the time it was made because Tinder's MAU issues had not yet begun to materially stabilize.

30.     On the Q2 2024 earnings call, Defendant Kim made the following statement:

Over the last several quarters, Tinder has been working hard to improve the user experience, and we're now starting to see initial signs of progress. User and payer trends are stabilizing, and we expect them to continue to improve

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

from here. ***We expect strong sequential payer growth in Q3 and better year-over-year MAU trends in the second half of the year.***

As the largest dating app in the world, it's Tinder's job to deliver for its users, which in turn helps attract new users. ***Tinder is building on its fun legacy and its iconic swipe experience by continuing to increase authenticity and realness and by setting the industry standard for trust and safety***. We believe this will address some of the concerns that users have been vocal about more recently.

(Emphasis added).

31.    The statement in ¶ 30 was materially false and misleading at the time it was made because Tinder's MAU issues had not begun to stabilize.

32.    The Q2 2024 earnings call included the following exchange between Defendant Kim and Nathan Feather, a Morgan Stanley analyst:

**Feather**: Hey, everyone. ***Congrats on the stabilization and Tinder user growth in the quarter***. Is there anything outsized that led to that stabilization or more so stacking of a variety of individual improvements? And can you help us contextualize how much of that is due to new user trends versus retention? Thank you.

**Kim**: Thanks, Nathan, for that question. I really like how you framed it around stacking Tinder product improvements. Our work is really a combination of product initiatives building on each other over time. And this is reinforced with really strong marketing that is helping drive stabilization and start contributing to improvements on the back half of this year. The trust and safety moves that we made last year are one of -- is a great example of stacking initiatives, which we know were the right decisions. And the good news is we've worked through a lot of those -- a lot of that noise and has led to better user outcomes and say that the user base has stabilized, retention is improving and growing and we're making strides in top of funnel again. It's a really exciting time period for Tinder.

(Emphasis added).

9

33.    The statement from Defendant Kim in ¶ 32 was materially false and misleading at the time it was made because Tinder's MAU issues had not begun to stabilize.

34.    On August 1, 2024, the Company filed with the SEC its report on Form 10-Q for the period ending June 30, 2024 (the "2Q24 Report"). Attached to the 2Q24 Report were certifications pursuant to SOX signed by Defendants Kim and Swidler attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

35.    The 2Q24 Report incorporated by reference the risk disclosures in the 2023 Annual Report, one of which was materially false and misleading when made for the reasons discussed in ¶ 22.

36.    The statements contained in ¶¶ 18, 21, 24, 25, 28, 30 and 32 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Match Group materially understated the challenges affecting Tinder and, as a result, understated the risk that Tinder's monthly active user count would not recover by the time the Company reported its financial results for the third quarter of 2024; and (2) as a result, defendants' statements about Match Group's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## **THE TRUTH BEGINS TO EMERGE**

37.    On November 6, 2024, Match Group published its Q3 2024 shareholder letter. The shareholder letter included the following disclosure:

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

Tinder MAU was down 9% Y/Y in Q3, which was the same rate of decline as in Q2, falling short of our expectations for continued improvement in Y/Y trends. From mid-September through October, we saw more pressure on new users (registrations and reactivations) than we expected, which has led to pressure on MAU.

Tinder's primary focus remains driving its product transformation efforts forward to improve ecosystem health and user outcomes, which we believe are necessary for durable improvements in user, Payer, and revenue trends.

38.    On November 7, 2024, Investopedia published an article entitled "Match Group Stock Slips as Fourth Quarter Outlook Disappoints." This article stated, in pertinent part, the following:

Shares of online dating giant [Match] tumbled Thursday morning despite a third-quarter earnings beat released after the bell Wednesday.

\*    \*    \*

Revenue and downloads of Hinge continued to grow, ***but Match said Tinder Direct revenue came in below its own expectations, as the app's monthly active users (MAUs) declined 9% from the same time last year and its revenue per payer (RPP) grew less than expected***. ***Some new features tested with Tinder users in the quarter negatively impacted subscription revenue, which the company said will likely also have an impact on fourth quarter revenue***.

(Emphasis added).

39.    On the accompanying Q3 2024 earnings call on November 7, 2024, Bernard Kim made the following statement about Tinder:

As I mentioned during our last call, shareholders rightfully expect both short and long-term results. In the short-term, Tinder's direct revenue was slightly below our expectations driven by the under delivery of certain optimizations. However, Tinder added 311,000 payers sequentially and declined by only 4% year-over-year. This was well above our outlook provided in late July.

***While we're pleased with the results on payers, we saw less progress on Tinder MAU than we expected***. Tinder remains focused on the long-term

11

testing several important new features aimed at cleaning up its ecosystem and improving user outcomes. This includes testing mandated face photos in several markets.

\*       \*       \*

We're pleased with the progress we've seen recently at Tinder on product execution, but are far from done. The team is working tirelessly pushing forward with initiatives to drive Tinder's transformation forward. ***At the same time, we're clear eyed that Tinder's progress will not always be linear because we know that transformation, such as these, take time.***

(Emphasis added).

40.    On the same earnings call, Defendant Swidler stated the following:

Tinder MAU were down 9% in the quarter consistent with Q2 trends. ***We had expected to see improvement in year-over-year MAU trends in the quarter. However, in mid-September, we began to see weaker new user trends, which includes new registrations and reactivations of lapsed users than is typical at this time of year***, a trend that has stabilized in October.

The pressure on new users was largely confined to iOS. We are working collaboratively with Apple to investigate whether it's related to the introduction of iOS 18 in mid-September, certain trust and safety enhancements we made or another cause. ***This in turn has caused pressure on Tinder MAU***. We are working on a number of initiatives to improve this trend.

(Emphasis added).

41.    The Q3 2024 earnings call included the following exchange, illustrating the number of challenges continuing to affect Tinder:

**Analyst**: Great. So I guess, Gary, starting with the Tinder top of funnel trends, could you just elaborate a little bit more on what's going on? You mentioned iOS and a few other things around top of funnel and the weaker MAU at the end of 3Q and then what's happening right now in 4Q? And as we turn ahead to '25, other than cranking on marketing, what other trends might help drive top of funnel at Tinder? And I guess it's related to this, did

12

you feel like Tinder's operating margin at 52% is at the right level or how do we think about that long-term? Thank you.

**Bernard Kim**: Thanks, Ross. This is BK. I'm going to handle the first part of that question and Gary can jump in on the margin side. So we did see a step back in Tinder's MAU growth starting in mid-September. And as Gary mentioned in his comments, we're investigating several possible causes. This includes the introduction of iOS 18 and some recent trust and safety enhancements that may have added to friction for daters. While I believe this step back isn't what we wanted, we don't see this as a long-term structural shift. Our team's top priority remains driving product innovation and that's where Tinder's focus is. We know we need to clean up the ecosystem and create better experiences, especially for younger users and women and we're working on it, but meaningful changes do take time. Now you mentioned marketing and it's definitely key to reinforce Tinder's brand and promoting new products. But marketing alone will not drive top of funnel growth. That's why our focus is on product-led strategies to build sustainable engagement. We're excited for Investor Day, so we can lay out our product roadmap and discuss our plans to get Tinder back on track. We're confident in these plans.

42.     On this news, the price of Match stock fell by $6.77 per share, or 17.8%, to close at $31.11 per share on November 7, 2024.

43.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

44.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired the Company's securities publicly traded on NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal

13

representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

45.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

46.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

47.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

48.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

• whether the Exchange Act was violated by Defendants' acts as alleged herein;

• whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

• whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of the Company securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

49.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

50.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's shares met the requirements for listing, and were listed and actively traded on NASDAQ, an efficient market;

- as a public issuer, the Company filed periodic public reports;

- the Company regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

51.     Based on the foregoing, the market for the Company's securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

52.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I

### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants

53.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

54.     This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

55.     During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

56.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

•     employed devices, schemes and artifices to defraud;

•     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

•     engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

57.     Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

58.     Individual Defendants, who are the senior officers of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or any other of the Company's personnel to members of the investing public, including Plaintiff and the Class.

59.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

60.    Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

61.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

62.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

### COUNT II

**Violations of Section 20(a) of the Exchange Act**

**Against the Individual Defendants**

63.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

64.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because

of their senior positions, they knew the adverse non-public information about the Company's business practices.

65. As officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's' financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

66. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

67. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a) declaring this action to be a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Lead Counsel;

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

(b)     awarding damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, together with interest thereon;

(c)     awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated:        11/25/2024                        **THE ROSEN LAW FIRM, P.A.**

/s/ Laurence M. Rosen
Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS